McNULTY, Judge.
In this, the first “wiretap” case to reach us after full trial, appellants were convicted of the felony of aiding and assisting the conducting of a lottery in violation of § 849.09(1)(d) F.S.1969, F.S.A. They raise eight points on appeal but only one merits discussion, and that relates to the validity of the wiretap order entered herein by a circuit judge on March 20, 1970, pursuant to Ch. 934, F.S.1969, F.S.A. The principal assault on such order is the “lack of probable cause” for the issuance thereof, which, in turn, is predicated on two grounds: (1) insufficiency of sworn-to facts and circumstances, and (2) the long intervals of time between the events related in the affidavit of application and between the last such event and the date of the application. We reject appellants’ argument and affirm.
The following relevant facts are not in dispute. Appellant Roland Rodriguez, allegedly the kingpin of the purported lottery ring, resided at Route 2, Box 731 (Berger Road), Lutz, Florida with his wife, appellant Julie Rodriguez, and his step-daughter, one Linda Fieger. There were three separate phones installed at that address, each listed in one of the foregoing three names, and all three phones were tapped pursuant to the aforesaid order. Additionally, it appears from the affidavits in support of .the application therefor, as evidenced by the following portions of the affidavit for the tap of appellant Roland Rodriguez’ phone which is typical, that:
“Your Affiant has been employed by the Hillsborough County Sheriff’s Office since September, 1967, as a Deputy Sheriff. Your Affiant is personally engaged in the investigation of illegal Lottery and Bookmaking operations in Hillsborough County, Florida, and has been so engaged for the past seventeen (17) months. During this time your Affiant has received information from different City, County and Federal Law Enforcement Agencies that one Roland Rodriguez, white male, age, fifty-one (51) years, is engaged in Lottery operations as a banker. The aforesaid Roland Rodriguez has two (2) convictions for illegal Lottery operations in Hillsborough County and has served sentences in the Hillsborough County Jail and State Prison.
Your Affiant based on information received from County and Federal Law En *3 forcement Agencies on 12 May 1969 initiated an investigation conducted at 1906 - 14th Street, Tampa, Hillsborough County, Florida, at the premises known as the Good Taste Restaurant also known as ‘El Bien Gusto.’ During this investigation your Affiant instructed a confidential informant to go to the said Good Taste Restaurant on the 12th day of May, 1969, and therein to attempt to purchase shares in a Lottery commonly known as Bolita, Cuba and/or Bond.
This confidential informant has been personally known to your Affiant for the past two (2) years and has furnished your Affiant on numerous occasions information which has proven reliable and trustworthy in the past and that said information received from said confidential informant in 1969 resulted in the arrest of nine (9) individuals for Lottery Law Violations. Said arrests resulted in five (5) convictions and four (4) of said individuals are still awaiting trial in the Criminal Court of Record in and for Hillsborough County, Florida.
Said confidential informant stated that he attempted to place a bet on the outcome of a Dogtrack race with an unknown white male of obvious Latin extraction. Said unknown white male advised the confidential informant to ‘Wait a minute.’ The said unknown white male went over to a table within said premises and in full view of said confidential informant seated himself with a second unknown white male of obvious Latin extraction and the two (2) white males conducted a short whispered conversation after which the first of said unknown white male returned to the confidential informant and advised him that he, the confidential informant, ‘Could not place a bet on the Dogs,’ but that he could ‘Play a Bond number.’ That said informant at that time purchased a Share or Bond number 113 for fifty cents ($.50).
Your Affiant on the afternoon of 13 May 1969 met again with the same confidential informant and instructed him to return to the aforesaid Good Taste Restaurant and there he again placed bets on the ‘Dogs’ and purchased ‘Shares’ in a Lottery. Immediately thereafter, the aforementioned confidential informant met with your Af-fiant advising him that he had placed bets on the ‘Dogs,’ 1-3 and 3-1 for fifty cents ($.50) each which is commonly known as the Daily Double, also the number 11 for fifty cents ($.50) on the ‘A’ House Bolita, and number 111 for fifty cents ($.50) on the Bond from a third unknown white male of obvious Latin extraction. At that time your.Affiant showed him several official photographs of known Bookie and Lottery operators in Hillsborough County and from the aforementioned photographs, confidential informant positively identified Roland Rodriguez as the second unknown white male seen on 12 May 1969. Said confidential informant further identified Estaban Rodriguez as being the third unknown white male from whom he had purchased shares in a Lottery and placed bets on the Dogs on the 13th day of May, 1969; said Estaban Rodriguez is a brother of Roland Rodriguez.
As a result of the above information, Estaban Rodriguez on May 15, 1969, was charged with two (2) counts of Aiding and Assisting in the Operation of a Lottery and one (1) count of Possession of Lottery Tickets. Jesus Soler at a later date was identified as the first aforementioned white male and was later charged with one (1) count of Aiding and Assisting in the Setting up and Conducting of a Lottery as a result of the information received from the confidential informant. These charges are presently pending in the Criminal Court of Record in and for Hillsborough County, Florida.
Your Affiant was contacted in September, 1969, by one Paul Magallanes, a special agent for the Federal Bureau of Investigation, who was investigating information relative to the arrest of one Clem-ente Lopez and Johnny Simmons by your Affiant on the 21st day of May, 1969, for conducting illegal Lottery operations at the premises of 1301 Central Avenue, Tampa, *4 Florida, known as the El Chico Bar. Said Agent advised your Affiant that he was investigating illegal Lottery operations conducted by Roland Rodriguez who was disclosed as a banker for said illegal Lottery operations. Further, that the aforementioned Roland Rodriguez has one of the largest operations for the selling of Lottery in Hillsborough County and that said operation was being financed by the aforementioned Roland Rodriguez. Special Agent Paul Magallanes until his transfer in February, 1969, was assigned to the Tampa Field Office of the Federal Bureau of Investigation in the excess of one (1) year and was actively investigating illegal Lottery operations within Hillsborough County concentrating primarily on Roland Rodriguez during that period.
During November, 1969, your Affiant received information that a white male known then only as ‘Piccolo Pete’ was a Lieutenant in Roland Rodriguez’s organization and was the out of town ‘Pick-up man.’ In November, 1969, the aforementioned Agent, Paul Magallanes, advised your Affiant an investigation disclosed that ‘Piccolo Pete’ now identified as Oscar Peter Roque occupied a high position in Roland Rodriguez’s organization. Further, that the said Oscar Peter Roque drives a 1965 Chevrolet, tan, two door automobile, Florida ’69-70 license number 3-70560. Your Affiant, subsequent to receiving this information on several occasions observed the aforementioned vehicle at the Good Taste Restaurant occupied by an unknown white male of obvious Latin extraction later identified as the aforementioned ‘Piccolo Pete.’
During the month of February, 1969, your Affiant and Detective Gordon Davis of the Hillsborough County Sheriff’s Office began a daily surveillance of Roland Rodriguez. It became evident to your Af-fiant during this surveillance that Roland Rodriguez, in conducting his daily Lottery and Bookmaking operations, does not come into physical contact with any Lottery paraphernalia other than at'his residence which will be hereinafter corroborated in a later paragraph. That your Affiant from his experience in Lottery and Bookmaking operations has come to know that most of the transactions involved in a Lottery and Bookmaking operations are conducted by telephonic communications since this reduces the risk of being found in physical possession of Lottery paraphernalia.
On the 11th day of February, 1970, your Affiant and Detective Gordon Davis served a Capias issued from the Criminal Court of Record in and for Hillsborough County, Florida, on one Maggie Anderson, Nebro (sic) female. At the time the Capi-as was executed, Detective Gordon Davis advised the said Maggie Anderson of hier (sic) Constitutional Rights. Maggie Anderson is the wife of one Randall Anderson who operates Maggie’s Sundries at 1252 East Cass Street, Tampa, Florida, and who has convictions for illegal Lottery operations in Hillsborough County. While transporting the said Maggie Anderson to the County Jail, she advised your Af-fiant that her husband, Randall Anderson worked for Roland Rodriguez in a capacity of a Bolita seller. Further, that Roland Rodriguez told her husband that he was very disturbed by certain information ‘leaking out’ that persons engaged in Roland Rodriguez’s Lottery operation were immune from arrest and that Roland Rodriguez has ‘contacts in the right places.’ On the 13th day of February, 1970, your Affiant in the presence of Detective Gordon' Davis contacted Randall Anderson at 1252 East Cass Street and asked him if he worked for Roland Rodriguez and would he testify on behalf of the State and said Randall Anderson refused to cooperate.
On the 4th day of March, 1970, your Af-fiant met with Richard Booth, investigator for the State Attorney’s Office of Hills-borough County, Florida. Your Affiant was advised that a subject known as Vasi-lios Marylis, white male, age seventeen (17) years, contacted Richard Booth and offered to give information concerning Roland Rodriguez’s Lottery operations. Your *5 Affiant and Richard Booth interviewed this subject relative to his information. Vasilios Marylis advised that he has been associated with Roland Rodriguez by virtue of dating his stepdaughter, Linda Fie-ger, who resides in Roland Rodriguez’s home located at Route 2, Box 731 (Berger Road) Lutz, Florida. Vasilios Marylis advised that he has on numerous occasions been present at the aforementioned home while Roland Rodriguez has conversed with unknown parties by telephone. He states that conversations he has overheard include such terms .as matinee, pari-mutuel, Bolita, Cuba and/or Bond and spoken numbers. Vasilios Marylis states that during these conversations he observed Roland Rodriguez making notations on paper. He states that the above actions generally have taken place between the hours of 6 p. m. and 8 p. m. in Roland Rodrigiez’s (sic) home. He further advises that Roland Rodriguez’s wife is normally present with other members of the family during these telephonic transactions. Vasilios Marylis was further advised by Linda Fieger that her stepfather is conducting a ‘Numbers operation’ along with taking dog bets on races run at a local dogtrack, which operations is largely conducted by telephone from his residence located at Route 2, Box 731 (Berger Road) Lutz, Florida. He further states that while a guest in Roland Rodriguez’s residence, he met and conversed with a subject known to him as Uncle Pete. He later identified Uncle Pete as being ‘Piccolo Pete’ also known as Oscar Peter Roque, and states he has been told by Uncle Pete that he is an out of town numbers ‘Pick-up man’ for Roland Rodriguez. He states this subject drives a 1965 Chevrolet, tan, two door vehicle. Vas-ilios Marylis also advises that he has seen Uncle Pete on numberous (sic) occasions give Roland Rodriguez large sums of money. He describes this money as being paper currency wrapped with writing paper of an unknown description secured by rubber bands. He further advised that Uncle Pete has told him that the money is wrapped in this way so that it could easily be thrown from an automobile should he be in flight from any law enforcement agency. Vasilios Marylis further states that Linda Fieger told him that Roalnd (sic) Rodriguez was writing the numbers received by telephone down on paper that can be discarded in the toilet or easily consumed by flame. This description based on your Affiant’s experience in Lottery and Bookmaking operations is believed to be paper commonly known as flash paper and/or water soluble paper -which is used in Lottery and Bookmaking operations because of it’s (sic) quick disposable characteristics. Vasilios Marylis advised that he has also visited a home located at 4439 Perch Street, Tampa, Florida, this being the home of Manuel and Margaret Rodriguez, and states that while in this home he has observed Roland Rodriguez use the telephone in the same manner as he observed previously at the same Roland Rodriguez’s residence, i. e., writing numbers on paper. He states that this home at 4439 Perch Street, Tampa, Florida, is located across the street from Roland Rodriguez’s former residence at 4438 Perch Street, Tampa, Florida, and at that time the said Roland Rodriguez was still living there. He states that he was told by Linda Fieger that Roland Rodriguez has an informant employed by a law enforcement agency and when a warrant is obtained for him or a member of his organization, he would be contacted and informed and at this time he would move across the street at 4439 Perch Street, Tampa, Florida, and use the phone there to conduct his Lottery and Bookmaking operations in safety.
Due to the aforementioned statements and information received, your Affiant believes and has reason to believe a large scale Lottery and Bookmaking operation is being conducted contrary to Florida Statute 849.09 and Florida Statute 849.25 with Roland Rodriguez in the capacity of a banker and that the major portion of this operation is being conducted by telephonic communications from the said Roland Rodriguez’s home located at Route 2, Box 731 (Berger Road) Lutz, Florida. . *6 Affiant has been connected with the investigation of Lottery Law Violations for seventeen (17) months. It has been his experience that in violations of this nature communications such as that sought to be intercepted occur most numerously between the hours of 6 p. m. and 12 o’clock midnight and 6 o’clock a. m. to 11 o’clock a. m. One isolated phone call of this nature would not be sufficient to establish subject’s Modus Operandi. Affiant, based on his general experience and observations of this particular suspect, states that communications of the type sought to be intercepted will occur with great frequency during the above-mentioned hours everyday of the week with less frequency on Sunday, even after the initial interception acquired pursuant to this application.”
* * * * * *
Concededly, in some respects the affidavits may include some impermissible hearsay and irrelevancies. But considering the relevant allegations in their entirety as each correlates with the others, and taking them together with the aforesaid undisputed facts concerning the residence and phones, the following at least is shown:
1. Appellant Roland Rodriguez was a known ' convicted lottery operator in Hillsborough County and had served sentences therefor in the past.
2. Three separate phones and numbers were listed in three different names at Roland Rodriguez’ private residence. [This unusual circumstance when considered with all others, surely contributes to suspicion.]
3. A reliable confidential informant previously made actual purchases of bolita tickets and placed bets on dog races on two separate occasions at the “El Bien Gusto” restaurant. On the first occasion the purchase was made under circumstances indicating the^ full knowledge and authority of Roland Rodriguez. On the second occasion the purchase was made directly from Roland’s brother, Esteban, a co-defendant herein (though acquitted at the trial hereof).
4. One Maggie Anderson, wife of a known convicted lottery figure advisedly indicated 38 days before the date of application for the wiretap order that her husband worked regularly for Roland Rodriguez as a boli-ta seller.
5. Within 20 days before the application, a boyfriend of appellant Rodriguez’ stepdaughter stated that, while present in appellant’s house on numerous occasions, he observed Roland engaged in various bookmaking and lottery operations. [Several details of the boyfriend’s statement are consistent with other information reliably received or personally known by the affiant and, thus, served sufficiently to corroborate the boyfriend’s reliability as an informant. For instance, the boy told of seeing a “Piccolo Pete” helping appellant Rodriguez in the gambling operations and observed that this man drove a 1965 tan Chevrolet. This is consistent with other information relating to the activities, identity and involvement of “Piccolo Pete” previously given to the affiant, and is also consistent with the affiant’s personal observations of “Piccolo Pete” and the aforesaid 1965 automobile.]
6. That these and other events recited in the affidavit covered a period of some ten months prior to the date of application for the wiretap and were continuous until up to thirty-eight days (as near as can be precisely determined from the affidavit) before the issuance of the order.
7. That all such events were, in the expert opinion of an experienced police officer, clearly indicative of a large scale and continuous lottery and bookmaking operation.
*7 From the foregoing, and leaving aside for the moment the time periods involved, we think that certainly an issuing magistrate, as a prudent and cautious man, would he reasonably justified in harboring a belief that Roland Rodriguez was engaged in a continuous lottery and/or bookmaking operation and that the phones in his home were likely then (i. e., on the date of application) being used in furtherance thereof in violation of the gambling laws. This is the classic test of probable cause,[1] and we see no reason why probable cause within the contemplation of Ch. 934, F.S.1969, relating to wire tapping, ought be any different from that required in the ordinary case for the issuance of search warrants generally. We hold, therefore, that the above facts and circumstances are sufficient to support probable cause, unless otherwise diluted by time factors.
Coming, then, to such time factors, i. e., the intervals between relevant events and also between the last such event and the date of application for the order, appellants contend that the events and circumstances relied upon all occurred at too wide intervals to establish a regular course of conduct and too long prior to the issuance of the order to support probable cause therefor. They’re wrong.
Concerning the intervals between events, we do not hesitate to hold that the totality of facts and circumstances clearly support the conclusion that there was continuing and regular illegal gambling activity. While specific instances cited may have spanned considerable time periods, the interlocking circumstances, particularly as related by Randall Anderson’s wife and the stepdaughter’s boyfriend, demonstrably establish, prima facie, a going and successful enterprise, not a “fly by night,” “floating” operation. Nearly everyone identified as being involved had roots in Tampa, had long engaged in illegal gambling activities and were trusted and faithful members of Rodriguez’ ring. Moreover, the entire operation was big enough to have “contacts in the right places” and an informant connected with law enforcement. These facts are hardly consistent with mere occasional personal escapades involving a bet now and then.
As to the interval between the last sworn-to fact and the date of issuance of the wiretap order, appellants emphasize that it exceeded 30 days. Accordingly, they say, the order is void as a matter of law. They rely principally on Hamelmann v. State,[2] in which our sister court in the First District held a time lapse of more than 30 days to be fatally unreasonable, saying:
, . . Barring extraordinary circumstances which may be shown to exist in any given case, the pattern has been rather clearly established in courts of this country that if the observation of the alleged offense is not farther remote than 30 days from the making of the affidavit and issuance of the warrant, a finding that there exists probable cause will not be disturbed. The contrary appears where the elapsed time is more than 30 days from the date of the observation to the date on which the affidavit is executed and the warrant issued.”
To begin with, we reject the rationale that the “reasonableness” standard of the Fourth Amendment [3] requires an arbitrary 30 day cut-off date beyond which reported activity cannot, as a matter of law, ordinarily support probable cause for the issuance of a search warrant.[4] Moreover, we doubt that Hamelmann stands *8 for such a proposition either. It isn't at all clear from a reading of that case just what suspicious activity was relied upon as a basis for probable cause. Apparently it related to the operation of a “house of ill fame,” yet the crime ultimately charged was the unlawful possession of amphetamines (a nervous system stimulant) ; and we don’t know if the two activities were related in any way. In any case we can assume that the Hamelmann court could not find any '‘extraordinary circumstances” of which it spoke which would operate to toll the 30 day cut-off period. We take it, then, that the activity relied upon for probable cause in that case was a fleeting or passing activity; that is, one .which was at least equally as amenable to the inference that it had ceased after a lapse of more than 30 days as it was to a contrary inference. In other words, it could not be said there that the reported activity was a likely activity on the date of issuance of the search warrant.
The point we make is, the mere lapse of an arbitrary time period cannot of itself vitiate probable cause in these cases. A time lapse is unquestionably a factor, but the paramount question remains whether the reported activity is likely still going on; and the answer to that, we suggest, may very well inhere in the nature of the criminal activity involved.[5] Reported occasional possession and use of a non-addicting drug, for example, probably could not survive more than a 30 day hiatus; but can the same be said of reported regular possession and use of heroin?
 So it is in this case. The affidavits clearly reveal a sequence of highly suspicious events and circumstances indicative of a large scale bolita and bookmaking operation, involving known bolita operators and minions, continuing over a period approximating 10 months. There is nothing to suggést that such operation had ceased or that in its usual course it otherwise permitted a lengthy respite from regular activity. Concededly, the last reported activity cannot be pinpointed within 38 days of the issuance of the assailed order, except by inference from the boyfriend’s story; but as of that late date the affiant had reliable information from Randall Anderson’s wife that the suspected operation was then going on and that Randall Anderson was involved therein. Furthermore, while it is true that a “neutral and detached” magistrate is without authority to base probable cause solely on the suspicions of a police officer, nevertheless he may consider underlying facts and circumstances upon which the officer’s suspicions rest, together with the officer’s expertise on the significance thereof, in determining the likelihood of regular and continued activity.[6] The circuit judge did so here and we cannot say as a matter of law that he erred either in law or fact in so concluding.
No reversible error being made to appear, therefore, the judgments of conviction and sentences herein should be, and they are hereby, affirmed.
Affirmed.
MANN, C. J., and BOARDMAN, J„ concur.

. See, e. g., 29 Fla.Jur., Search and Seizure, § 31, et seq.

. (Fla.App.1959), 113 So.2d 394.

., Constitution of the United States. See, also, § 12, Declaration of Rights, Fla.Const., F.S.A.

. Indeed, in Brown v. State (Fla.App.1972), 261 So.2d 539, decided without opinion, this court necessarily rejected Hamelmann.

. 100 A.L.R.2d 525, 542 et seq.

. See, Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).